**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**


HERMAN V. TATE,                          )
                                         )
                    Plaintiff,           )
                                         )
          v.                             )          1:14cv125
                                         )
LEWIS SMITH, et al.,                     )
                                         )
                    Defendants.          )


**MEMORANDUM OPINION AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the undersigned United States Magistrate Judge for a recommendation on "Defendants' Motion for Summary Judgment" (Docket Entry 89) (the "Summary Judgment Motion"). For the reasons that follow, the Court should grant the Summary Judgment Motion.

**BACKGROUND**

### I.  Procedural History

In February 2014, Plaintiff Herman V. Tate ("Plaintiff") commenced this action against three Albemarle Correctional officers, Lewis Smith (occasionally, "Smith"), Richard Russell (occasionally, "Russell"), and Wendy Brewton ("Brewton"), alleging that they illegally destroyed his personal photographs. (Docket Entry 2; see also Docket Entries 11, 66.) In September 2014, Russell and Brewton moved to stay this action pending final resolution of related North Carolina Industrial Commission (the

"NCIC") proceedings. (Docket Entry 34 (the "Stay Motion").)[1] In support of their Stay Motion, Russell and Brewton submitted various materials from those proceedings (see Docket Entries 35-1 to 35-34), including the NCIC's final decision and order in Plaintiff's action against the North Carolina Department of Public Safety (the "NCDPS") regarding the destruction of his photographs (see Docket Entry 35-29 (the "NCIC Opinion")).[2] The Court (per United States District Judge Catherine C. Eagles) granted the Stay Motion. (Docket Entry 40.) The stay remained in place until March 2016, at which time, in accordance with the Court's order (see Docket Entry 65 at 2), Plaintiff filed an amended complaint (Docket Entry 66) (the "Second Amended Complaint"). (See Text Order dated Mar. 11, 2016.)

The following month, Smith, Brewton, and Russell (collectively, the "Defendants") filed their Answer. (Docket Entry

---

1 Due to difficulty in effecting service upon him, Smith had not begun participating in this action as of September 2014. (See Docket Entry 81 at 1-3, 19 (discussing Smith's participation history).) [Citations herein to Docket Entry pages utilize the CM/ECF footer's pagination.]

2 Plaintiff initiated the NCIC action against the NCDPS, Brewton, and Russell. (See Docket Entry 35-2 at 2; Docket Entry 35-4 at 3.) Following a defense motion to dismiss the NCIC action against Brewton and Russell "on the grounds that an individual cannot be named as a Defendant under the Tort Claims Act, and the [NCIC] does not have jurisdiction over claims filed against individuals" (Docket Entry 35-4 at 3), Plaintiff dropped all claims against Brewton and Russell in the NCIC proceedings (see Docket Entry 35-9 at 2). [For legibility purposes, this Opinion uses standardized capitalization in all quotations from the parties' materials.]

70.)[3]  In so doing, Smith waived his insufficiency of service of process defense.  (<u>See generally</u> Docket Entry 81; <u>see also</u> Docket Entry 83.)  Shortly thereafter, Plaintiff filed a motion for summary judgment (Docket Entry 71), which the Court denied for failure to adduce sufficient supporting evidence (<u>see</u> Docket Entry 77 at 1 (explaining that "[Plaintiff] has not offered any evidence in support of his motion, other than some pieces of paper as to which the purpose and meaning is not clear")).  In January 2017, Defendants filed their Summary Judgment Motion.  (<u>See</u> Docket Entry 89.)  Plaintiff sought an extension of time to respond to the Summary Judgment Motion, on the grounds that he will "be release[d] from pri[so]n[] on 2-1-2017," and desired "30 days to seek counsel" following his release.  (Docket Entry 97 at 1.)  The Court (per the undersigned) extended Plaintiff's response deadline to March 14, 2017 (<u>see</u> Text Order dated Feb. 21, 2017), but Plaintiff failed to file a response to the Summary Judgment Motion (<u>see</u> Docket Entries dated Jan. 4, 2017, to the present).

---

3    In conjunction with lifting the stay, the Court ordered that Plaintiff's "Petition to Amend Complaint" (Docket Entry 66) "be treated as a Second Amended Complaint and the Clerk shall so designate it on the docket."  (Text Order dated Mar. 11, 2016.) Notwithstanding this Order, Defendants filed their Answer in "respon[se] to the surviving claims from Plaintiff's Amended Complaint" (Docket Entry 70 at 1 (citing Docket Entry 11)).  (<u>See also</u> <u>id.</u> at 1 n.2 ("Defendants are not providing a response herein to the allegations made in the document captioned 'Plaintiff's Second Amended Complaint' [D.E. #66] as it does not appear that amendment has been permitted by the Court [D.E. #65]." (brackets in original)).)

## II.  Factual History

This matter arises from Russell's destruction of Plaintiff's photographs on January 27, 2012.  (See Docket Entry 11-2 at 9; see also Docket Entry 90, ¶ 12.)  Based on the record before the Court, the following facts qualify as undisputed:

Albemarle Correctional officers seized the photographs from Plaintiff during a scheduled visitation on January 15, 2012.  (See, e.g., Docket Entry 35-2 at 2; Docket Entry 35-13 at 3-4; Docket Entry 90, ¶¶ 6-7; see also Docket Entry 2 at 3.)  On January 25, 2012, an Albemarle Correctional Disciplinary Hearing Officer (occasionally, the "DHO") conducted a hearing regarding the seizure of Plaintiff's photographs and ordered their return to Plaintiff (the "DHO Order").  (See, e.g., Docket Entry 35-11 at 10; Docket Entry 35-13 at 4; Docket Entry 71-2 at 1; Docket Entry 90, ¶¶ 9-10; see also Docket Entry 35-2 at 2; Docket Entry 66 at 3.)  Russell knew of, but declined to comply with, the DHO Order when he destroyed Plaintiff's photographs.  (See, e.g., Docket Entry 11-2 at 1-2, 9; Docket Entry 90, ¶ 12; see also Docket Entry 35-2 at 5; Docket Entry 66 at 3.)

In contrast to the foregoing undisputed matters, the record presents diverging accounts of both the circumstances surrounding the introduction of the photographs into the visitation area and Defendants' duty to abide by the DHO Order.  In that regard, the record reflects the following:

4

**A. DHO Order**

The DHO Order states that

> DHO reviewed the evidence and felt that there were procedur[al] errors made at the scene of the incident. DHO request[s] that this case be addressed at the unit level through counseling with any reoccurr[e]nces to be addressed through Disciplinary. Confiscated items to be returned to [Plaintiff].

(Docket Entry 35-11 at 10.)[4]  The DHO Order also dismissed the disciplinary charge against Plaintiff regarding this incident. (<u>Id.</u>)

**B.  NCIC Deputy Commissioner's Decision**

Following an evidentiary hearing, NCIC Deputy Commissioner George T. Glenn, II, rendered a decision and order in Plaintiff's suit against the NCDPS (Docket Entry 35-13) (the "Deputy's Decision").  The Deputy's Decision contains the following findings of fact:

> 1.  All the parties are properly before the North Carolina Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter of this case.  All parties are bound by and subject to the North Carolina Tort Claims Act.  All parties have been correctly designated and there is no question as to the misjoinder or nonjoinder of any party.

---

4  The DHO Order appears in Plaintiff's NCIC motion for summary judgment (Docket Entry 35-11), which Russell and Brewton submitted in support of their Stay Motion.  In addition, Plaintiff submitted the DHO Order (<u>see</u> Docket Entry 80 at 5) in support of his request that the Court "reconsider Doc 71" and grant Plaintiff's motion for summary judgment (i.e., Docket Entry 71). (Docket Entry 79 at 1.)

2.  On January 15, 2012 [P]laintiff was a prison inmate incarcerated in the custody and control of [the NCDPS] being housed at Albemarle Correctional Institution.

3.  Plaintiff was scheduled for a visitor on January 15, 2012 and as he was entering the visiting area he brought with him 17 pictures of what he described as pictures of his family to show to his visitor.  Plaintiff was searched prior to being allowed into the visiting area at which time he showed the officer the pictures, and he also showed the pictures to the officer working on the entry way into the area where he was searched.  Both allowed him to go through with the pictures and [P]laintiff indicated that the reason he was allowed to go through their area with pictures is that they were new on the job.

4.  When [P]laintiff got into the visiting area Officer Watkins noticed the pictures and asked [P]laintiff how he had gotten them into the visiting area and [P]laintiff told her that he had showed them to the officers working the area of entry into the visiting area and they had allowed him to keep the pictures and bring them into the visiting area.

5.  Officer Watkins told [P]laintiff to put the pictures away but later returned to take the pictures after she had received a call over the radio instructing her to take the pictures because [P]laintiff was not allowed to have them in the visiting area in that it was against policy.

6.  It is [the NCDPS's] policy that neither inmates nor visitors are allowed to bring or have pictures or mostly anything else in the visiting area and if anything is brought into the visiting area without prior approval it is considered contraband and is to be immediately taken and this includes pictures.

7.  The inmates at Albemarle Correctional Institute are informed that they are not allowed to take anything into the visiting area unless it has been previously approved. Visitors are advised that they are not allowed to take anything into the visiting area unless it has been previously approved, including pictures.

8. Officer Watkins took the 17 pictures from [P]laintiff and the pictures were placed in the contraband safe in Lt. Richard Russell's office.

9. Plaintiff was charged with having contraband in the visiting area, the 17 pictures, and when his case was heard before the Disciplinary Hearing Officer, the hearing officer determined that there was procedur[al] error when the officers allowed [P]laintiff to take the pictures into the visiting area. He indicated that the matter needed to be addressed at the unit level through counseling with any reoccurrences to be addressed through disciplinary action . . . and that the confiscated items are to be returned.

10. Lt. Russell's duties at the time of this incident included the disposition of contraband. Lt. Russell reviewed the [DHO's] decision and when he noted that [the DHO] had recommended that the pictures be returned to [P]laintiff, he did not agree with that decision but felt that the pictures should be destroyed and because [sic] he was uncertain of how the pictures had gotten into the visiting area.

11. Lt. Russell contacted the Superintend[e]nt of Albemarle Correctional and explained his concern and asked what should happen to the pictures and he was told to destroy the same, therefore he destroyed the pictures.

12. Plaintiff is alleging that the [NCDPS] was negligent in destroying the 17 pictures and not either returning them to him or sending them to his home address given that he was not found guilty of the charges against him. It is clear that [P]laintiff is in disagreement with the Superintend[e]nt's decision to cause the pictures to be destroyed but he does not point to any policy the [NCDPS] may have breached which could possibly give rise to any negligence. The act that he complains of was an intentional act i.e. the decision to destroy the pictures.

13. Plaintiff has failed to prove that any employee/agent of [the NCDPS] was negligent and that if negligent that he is entitled to any relief.

(Id. at 3-5 (ellipsis in original).) Plaintiff appealed this decision. (See Docket Entry 35-29 at 2.)

## C. NCIC Opinion

On July 31, 2014, the Full Commission of the NCIC reversed the Deputy's Decision and awarded Plaintiff $200 from NCDPS. (Id. at 2, 7.) In so doing, the NCIC made the following findings of fact:

> 1. All the parties are properly before the North Carolina Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter of this case. All parties are bound by and subject to the North Carolina Tort Claims Act. All parties have been correctly designated and there is no question as to the misjoinder or nonjoinder of any party.
>
> 2. Plaintiff filed a claim for damages under the Tort Claims Act alleging that [the NCDPS's] employees and agents, including Captain Richard Russell, were negligent in destroying his personal property, specifically 17 family photographs, and that he has suffered damages in excess of $10,000.00 as a result.
>
> 3. On 15 January 2012, [P]laintiff was a prison inmate incarcerated in the custody and control of [the NCDPS] being housed at Albemarle Correctional Institution. On that date, [P]laintiff had a visitor.
>
> 4. Chapter 7, Subject 07.03 of the State of North Carolina Department of Correction Albemarle Correctional Institution Standard Operating Procedures sets out the Institution's inmate visitation procedures. Number 13 under Subject 07.03 states:
>
> > The Inmate will not be allowed to take anything in to the visitation room except for the clothes he has on (large brown coat will not be allowed in the visitation room), one wedding ring, ID card, picture ticket(s), watch and/or prescription eyeglasses. Any other item(s) must be pre-approved by the unit management staff and/or the Officer-in-Charge.
>
> 5. When [P]laintiff entered the visitation area, he was searched by Officer Pittman. During the search, [P]laintiff showed Officer Pittman 17 photographs of family members which he had with him and which he intended to show to his visitor. Officer Pittman allowed

8

[P]laintiff to proceed to the visitation area with his photographs.

6.   Plaintiff next encountered Officer Cable, who asked [P]laintiff what items he had with him.  Plaintiff was still holding his 17 photographs in his hand at the time.  Officer Cable allowed [P]laintiff to proceed to the visitation area with his photographs.

7.   Upon entering the visitation area, [P]laintiff laid his photographs down on a table.  Thereafter, Officer Watkins noticed the pictures and asked [P]laintiff how he had gotten them into the visitation area.  Plaintiff indicated that Officers Pittman and Cable had allowed him to keep the photographs with him.  Officer Watkins indicated that they should not have done so and instructed [P]laintiff to put the photographs away, which [P]laintiff did.

8.   Officer Watkins subsequently returned to the table where [P]laintiff was sitting with his visitor and took the photographs away.  The photographs were then placed in the contraband safe in Captain Richard Russell's office.

9.   Plaintiff was charged with a disciplinary offense for having contraband, the 17 photographs, in the visiting area.

10.   On [2]5 January 2012, [P]laintiff's case was heard by a disciplinary hearing officer who determined that a procedural error had been committed when the officers allowed [P]laintiff to take the photographs into the visiting area.  The hearing officer found [P]laintiff not guilty, dismissed the charge against him, and ordered the confiscated property to be returned to him.

11.   Captain Richard Russell testified that, in January 2012, he was employed by [the NCDPS] as a special operations lieutenant.  One of Captain Russell's job responsibilities at the time was managing the contraband locker, which is the institution's repository for items which have been confiscated.  Captain Russell reviewed "disciplinary cases that are complete and things to be destroyed."

12.   Captain Russell testified that, after reviewing the decision of the disciplinary hearing officer which found

[P]laintiff not guilty and ordered his property returned
to him, [Russell] consulted Administrator Lewis Smith and
the two agreed that [P]laintiff's photographs were
contraband of no value and should be destroyed. Captain
Russell destroyed [P]laintiff's photographs on 27 January
2012.

13.    Captain Russell testified that, despite the fact
that the disciplinary hearing officer found [P]laintiff
not guilty, dismissed the charge against him, and ordered
that his photographs be returned, [P]laintiff[']s
photographs were still deemed contraband. Captain
Russell further testified that [P]laintiff[']s
photographs would be considered "items which are of no
value or practical use" pursuant to Chapter F, Section
.0504(b) of the State of North Carolina Department of
Correction Division of Prisons Policy and Procedures, and
therefore, pursuant to the Policy and Procedures, the
proper means of disposing of the photographs was to
destroy them.

14.    The Full Commission finds that [the NCDPS's]
employees owed [P]laintiff a duty to dispose of his
confiscated property in keeping with the 25 January 2012
determination of the disciplinary hearing officer, that
[the NCDPS's] employees breached that duty by destroying
[P]laintiff's confiscated property in contravention of
that determination, and that [P]laintiff was damaged as
a result. Accordingly, [P]laintiff is entitled to be
reimbursed for his loss. The Full Commission finds that
an amount of $200.00 is reasonable to reimburse
[P]laintiff.

(Docket Entry 35-29 at 3-6 (internal brackets omitted).)[5]

---

    5  Asserting that "the $200 fail[ed] to adequately compensate
him for his loss of family photographs," Plaintiff attempted to
appeal the NCIC Opinion. Tate v. North Carolina Dep't of Pub.
Safety, No. COA 14-1274, 79 S.E.2d 787 (table), 2015 WL 6164156, at
*1 (N.C. Ct. App. Oct. 20, 2015) (unpublished), review dismissed
sub nom. Tate v. N.C. Dep't of Pub. Safety, 368 N.C. 690, 781
S.E.2d 616 (2016).  However, the North Carolina Court of Appeals
dismissed Plaintiff's appeal. Id.

## D.  Defendants' Version

In support of their Summary Judgment Motion, Defendants rely on Russell's affidavit (Docket Entry 90).  (See, e.g., Docket Entry 92 at 3-6.)  In relevant part, Russell's affidavit states:

6.  According to [Plaintiff's] disciplinary information and to the information relayed to me by correctional staff, on January 15, 2012, [Plaintiff] had a scheduled visitation. Prior to entering visitation, inmates are searched and required to sign a declaration which indicates what possessions they are entering the visitation area with.  On that day, [Plaintiff] declared that he had a pair of boots, an ID card, a locker key, and a pair of glasses.  [Plaintiff] did not declare any photographs, nor did staff observe him with photographs prior to visitation.

7.  During visitation, correctional staff observed [Plaintiff] looking at photographs.  Inmates are not permitted to possess photographs during visitation. The photographs were confiscated from [Plaintiff] and a contraband report was completed.  The photographs were placed in the contraband locker on that day — January 15, 2012.  Contraband number 806 was assigned to the photographs.

. . . .

9.  Also on January 15, 2012, discipline was initiated against [Plaintiff] for his attempt to smuggle the photographs from visitation into the prison.  The discipline proceeded to a disciplinary hearing on January 25, 2012.

10.  At the disciplinary hearing, the disciplinary hearing officer noted that he felt that [Plaintiff] should have been counseled for the infraction rather than face formal charges.  This was due, in part, to procedural errors with the disciplinary process — of which, I did not take part.  On the disciplinary paperwork, the officer noted that the photographs were to be returned to the inmate.

11.  On January 27, 2012, I reviewed the contraband report for the photographs taken from [Plaintiff] and I

11

consulted with Defendant Smith (then the facility
Administrator) regarding the contraband. This was
generally a task that I performed on Fridays and January
27, 2012, was a Friday.

12. Defendant Smith and I concluded that the items were,
in fact, contraband which [Plaintiff] had attempted to
smuggle into the prison. While the hearing officer
concluded that [Plaintiff] should not be disciplined for
his attempt, we agreed that the hearing officer's
decision did not change the status of the photographs as
contraband. As a result, Defendant Smith directed me to
dispose of the photographs as contraband — which meant
that the photographs were shredded. I noted on the
contraband report that I shredded the items.

. . . .

14. Again, [Plaintiff] did not have these photographs
prior to visitation or they would have been noted by
staff searching him prior to visitation. Moreover, he
would not have been permitted to take the photographs
into the visitation area. Inmates are informed of this
policy in their inmate handbooks and rules regarding
visitation. Correctional staff observed [Plaintiff]
looking at the photographs during visitation and then
witnessed him attempting to bring the photographs back
into the prison from the visitation area at the
conclusion of his visit. This classified the items as
contraband.

15. There is a very real danger posed by allowing
inmates to receive items from family members or friends
during visitation because those items are not subject to
the same scrutiny that they would be if received in the
mail or purchased from the inmate canteen. In other
words, staff cannot scrutinize the items to determine if
they contain illicit items such as drugs, tobacco, or
cell phones secreted inside a package for example. Or
for photographs, they cannot identify who is depicted,
whether the photos are appropriate — meaning not
containing illicit pornographic images or pictures of
drugs or alcohol or gang activities. Thus, there are
very strict security measures taken to inventory what
items inmates bring into visitation and what they bring
out of visitation — including a search of the inmates'
person.

16.  Inmates are permitted to purchase "tickets" to have photographs taken during visitation with their family or friends — so that correctional staff can ensure that the photographs are appropriate.  Additionally, photographs may be mailed into an inmate, but, in order to receive the photos, they would be scrutinized by mailroom staff and possibly by other correctional staff to ensure that they were appropriate for the inmate to possess.

17.  [Plaintiff], in this situation, simply chose not to obey the rules with regard to the photographs.  He could have purchased picture tickets to have photos made with visiting friends or family.  He also may have been able to receive the photos through the mail, if they were deemed appropriate.  He and his visiting friends simply chose not to obey the rules on how he could receive the property.  Again, this is explained to both inmates and visitors in the information distributed during orientation.  . . .

18.  While the disciplinary hearing officer may have expressed an opinion about whether the inmate should be charged with a disciplinary offense for his conduct — or even that the items should be returned to the inmate — the hearing officer does not have any control or decision-making ability with regards to what happens to contraband.  The hearing officer can only dismiss the disciplinary offense against the inmate.  [Plaintiff] was not determined to be "not guilty" [—] the offense was simply dismissed.  However, Mr. Smith was the facility Administrator at the time and the only individual with the ability to decide what is considered contraband per NCDPS policies based on the information provided to him.  The hearing officer has no authority to determine what items an inmate should be permitted to possess — especially when those items constitute contraband.

19.  When I consulted with Defendant Smith, we made the decision to destroy the photographs based on our determination that the items constituted contraband.  We made this decision to preserve the safety and security of the institution and in compliance with NCDPS policies.  The decision to shred the photographs as contraband was not made out of any animus, ill-will, or intent to harm

or retaliate against [Plaintiff] by myself or Defendant
Smith.

(Docket Entry 90, ¶¶ 6-7, 9-12, 14-19.)[6]

## **DISCUSSION**

### **I.  Summary Judgment Standards**

"The [C]ourt shall grant summary judgment if the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R. Civ.
P. 56(a).  A genuine dispute of material fact exists "if the
evidence is such that a reasonable jury could return a verdict for
the nonmoving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.
242, 248 (1986).  The movant bears the burden of establishing the
absence of such dispute.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317,
323 (1986).

In analyzing a summary judgment motion, the Court "tak[es] the
evidence and all reasonable inferences drawn therefrom in the light
most favorable to the nonmoving party."  <u>Henry v. Purnell</u>, 652 F.3d

_____

6  The organization representing Defendants served as defense
counsel in the NCIC proceedings.  (<u>See, e.g.</u>, Docket Entry 35-4 at
2, 4; Docket Entry 89 at 1-2.)  Russell likewise participated in
the NCIC proceedings.  (<u>See, e.g.</u>, Docket Entry 35-29 at 5
("Captain Richard Russell testified that . . . .").)  Additionally,
in moving for summary judgment on res judicata grounds, Defendants
purport to rely upon "the attachments []to" the Stay Motion (Docket
Entry 92 at 6), which include the DHO Order (Docket Entry 35-11 at
10), the Deputy's Decision (Docket Entry 35-13), and the NCIC
Opinion (Docket Entry 35-29).  Defendants, however, have not
addressed the factual findings in the DHO Order, Deputy's Decision,
and NCIC Opinion that explicitly contradict Defendants' version of
events.

524, 531 (4th Cir. 2011) (en banc).  Moreover, the Court "'*must*

review the motion, even if unopposed, and determine from what it

has before it whether the moving party is entitled to summary

judgment as a matter of law.'"  Robinson v. Wix Filtration Corp.

LLC, 599 F.3d 403, 409 n.8 (4th Cir. 2010) (emphasis in original)

(quoting Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 416 (4th

Cir. 1993)).  Nevertheless, summary judgment remains appropriate in

the absence of "evidence on which the jury could reasonably find

for the [nonmoving party]."  Anderson, 477 U.S. at 252.

## II.  Section 1983 Requirements

Alleging various constitutional violations, Plaintiff pursues

claims against Defendants pursuant to 42 U.S.C. § 1983.  (See

generally Docket Entries 2, 11, 66.)  In pertinent part, Section

1983 provides that

> [e]very person, who under color of any statute,
> ordinance, regulation, custom, or usage, of any State or
> Territory or the District of Columbia, subjects, or
> causes to be subjected, any citizen of the United States
> or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to
> the party injured in an action at law, suit in equity, or
> other proper proceeding for redress . . . .

42 U.S.C. § 1983.  To establish a Section 1983 claim, Plaintiff

must prove (1) that Defendants "deprived [him] of a right secured

by the Constitution and laws of the United States[] and (2) that

they deprived [him] of this constitutional right under color of

[State] statute, ordinance, regulation, custom, or usage."

15

Mentavlos v. Anderson, 249 F.3d 301, 310 (4th Cir. 2001) (internal quotation marks omitted; final set of brackets in original).

To satisfy the second element, "the deprivation must be caused by the exercise of some right or privilege created by the State . . . or by a person for whom the State is responsible, and the party charged with the deprivation must be a person who may fairly be said to be a state actor. [S]tate employment is generally sufficient to render the defendant a state actor." West v. Atkins, 487 U.S. 42, 49 (1988) (internal quotation marks and citation omitted; ellipsis and brackets in original). In this litigation, Defendants' undisputed status as Albemarle Correctional officers (see, e.g., Docket Entry 11 at 2-3; Docket Entry 90, ¶¶ 3, 11, 23) satisfies the state-actor element, see Evans v. McCall, Civ. Action No. 8:16-1112, 2017 WL 1190879, at *4 (D.S.C. Mar. 31, 2017) ("Here, [the d]efendants are prison officials employed by the State of South Carolina; therefore, there is state action."). However, the parties dispute whether Plaintiff satisfies the first element of his Section 1983 claim. (Compare Docket Entry 79 at 3 (asserting that "[Plaintiff] has demonstrated the essential elements of his claim with admissible evidence"), with Docket Entry 89 at 1 (asserting that "Plaintiff cannot demonstrate a violation of the Fifth, Eighth, or Fourteenth Amendments").)

### III. Plaintiff's Claims

Plaintiff contends that Defendants violated his constitutional rights by destroying his photographs. (See generally Docket Entries 2, 11, 66.) The Second Amended Complaint asserts that Defendants' actions violated Plaintiff's "constitutional rights of 5th and 14th Amendment." (Docket Entry 66 at 1.) It further alleges that Defendants' actions caused Plaintiff permanent memory loss, pain, and depression, and "w[ere] committed without due process of the law and [with] discriminatory intent." (Id.) In particular, the Second Amended Complaint challenges Defendants' destruction of Plaintiff's photographs in contravention of the DHO Order "without filing an appeal to get the verdict overturn[ed]." (Id. at 3; see also id. ("This malicious act was committed without an appeal.").)[7]

Additionally, although not developed in the Second Amended Complaint (see id. at 1-4 (alleging, without further elaboration, that Defendants acted with "discriminatory intent")), Plaintiff seeks to raise an equal protection claim regarding Defendants' failure to permit Plaintiff to mail the photographs home rather

_____

7  As Plaintiff challenges Defendants' failure to follow appropriate procedures in depriving him of his property, he raises a procedural due process claim. See Daniels v. Williams, 474 U.S. 327, 331 (1986) (discussing procedural and substantive aspects of the Due Process Clause); Love v. Pepersack, 47 F.3d 120, 122 (4th Cir. 1995) ("We divide due process into 'substantive' and 'procedural' prongs . . . ."); see also Parratt v. Taylor, 451 U.S. 527, 536-37 (1981) (classifying similar claim as procedural due process claim), overruled in nonrelevant part by Daniels, 474 U.S. at 328.

than destroying them (see Docket Entry 2 at 3-4; Docket Entry 11 at 3-4). In other filings, Plaintiff also asserts an eighth-amendment claim regarding alleged loss of memory. (See, e.g., Docket Entry 71 at 1 (identifying "cause of action" as "[t]he willful and wanton act of depriving [Plaintiff] of his civil rights, granted to him under the U.S[.] Constitution 5th, 8th, 14th Amendment"), 2 (alleging that the destruction harmed Plaintiff's "ability to remember, . . . which in turn [constitutes] c[ru]el and unusual punishment"), 6 ("8th Amendment prohibits against c[ru]el and unusual punishment.").)[8]

For their part, Defendants contend that summary judgment remains proper whether the Court construes Plaintiff's claims under "the Fifth, Eighth, or Fourteenth Amendments." (Docket Entry 89 at 1.)

**IV.  Ancillary Claims**

Plaintiff focuses primarily on the Fourteenth Amendment as the source of the constitutional rights at issue in this litigation and

_____

    8  The Second Amended Complaint does not explicitly reference the Eighth Amendment, but does state that Defendants' "willful[] and wanton[] act . . . gravely violates the accepted stand[a]rds of our society" (Docket Entry 66 at 4), echoing case law describing eighth-amendment protections, see Estelle v. Gamble, 429 U.S. 97, 102-03 (1976) ("Thus, we have held repugnant to the Eighth Amendment punishments which are incompatible with the evolving standards of decency that mark the progress of a maturing society or which involve the unnecessary and wanton infliction of pain." (citations and internal quotation marks omitted)). In light of the liberal construction afforded pro se pleadings, see Erickson v. Pardus, 551 U.S. 89, 94 (2007), the undersigned will construe the Second Amended Complaint as raising an eighth-amendment claim.

particularly on due process rights. (See, e.g., Docket Entry 2 at
3-4; Docket Entry 11 at 3-5; Docket Entry 71 at 3, 6.)
Nevertheless, assuming the Second Complaint fairly raises claims of
equal protection, fifth-amendment, and eighth-amendment violations,
these claims all fail as a matter of law.

### A.  Equal Protection and Fifth-Amendment Claims

First, in regard to the equal protection claim, Plaintiff
alleges that, although Defendants "would allow other [similarly
situated] inmates" to send "property of significant value home,"
they denied him such opportunity. (See, e.g., Docket Entry 11 at
4.)  In response to this allegation, Russell avers that Plaintiff
"was treated equally to other inmates." (Docket Entry 90, ¶ 24.)
Faced with this sworn statement, Plaintiff provided no evidence
suggesting that Defendants permitted another inmate to mail home
confiscated photographs.  These circumstances warrant summary
judgment in Defendants' favor on Plaintiff's equal protection
claim.  See Anderson, 477 U.S. at 248 (explaining that "a party
opposing a properly supported motion for summary judgment may not
rest upon the mere allegations or denials of his pleading, but
. . . must set forth specific facts showing that there is a genuine
issue for trial" (internal quotation marks omitted; ellipsis in
original)).

Second, in regard to Plaintiff's purported fifth-amendment
claims, Defendants qualify as state officials. (See, e.g., Docket

Entry 11 at 2-3 (identifying Defendants as Albemarle Correctional officers); see also Docket Entry 90, ¶¶ 3, 11, 23 (same).)  The Fourteenth Amendment rather than the Fifth Amendment governs the conduct of state officials.  See, e.g., Dusenbery v. United States, 534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law.'").  Accordingly, Plaintiff cannot pursue a separate fifth-amendment claim against Defendants.

**B. Eighth-Amendment Claim**

Finally, Plaintiff alleges that Defendants' destruction of his photographs deprived him of "the ability to remember, . . . which in turn [constitutes] c[ru]el and unusual punishment" (Docket Entry 71 at 2), in violation of the Eighth Amendment (see id. at 6).  The Eighth Amendment prohibits punishments that "are incompatible with the evolving standards of decency that mark the progress of a maturing society or which involve the unnecessary and wanton infliction of pain."  Estelle v. Gamble, 429 U.S. 97, 102-03 (1976) (citations and internal quotation marks omitted); see also Hutto v. Finney, 437 U.S. 678, 685 (1978) ("[The Eighth Amendment] prohibits penalties that are grossly disproportionate to the offense, as well as those that transgress today's broad and idealistic concepts of dignity, civilized standards, humanity, and decency." (citation and

internal quotation marks omitted)).  Accordingly, as relevant to Plaintiff's claim, "a prison official violates the Eighth Amendment only when two requirements are met.  First, the deprivation alleged must be, objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities. . . .  [Second], a prison official must have a sufficiently culpable state of mind."  <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994) (citations and internal quotation marks omitted); <u>see also</u> <u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986) ("To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety.").[9]

Defendants assert that qualified immunity shields them from Plaintiff's eighth-amendment claim.  (<u>See</u> Docket Entry 92 at 16-18.)  "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) (internal quotation marks omitted).  "The protection extends to all but the plainly incompetent or those who knowingly violate the law."  <u>Raub v. Campbell</u>, 785 F.3d 876, 881 (4th Cir.) (internal quotation marks

---

    9  Plaintiff does not contend that Defendants destroyed his photographs to punish him.  (<u>See generally</u> Docket Entry 66.)

omitted), <u>cert. denied</u>, __ U.S. __, 136 S. Ct. 503 (2015).  Under this doctrine, "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines."  <u>Id.</u> (internal quotation marks omitted; brackets in original).

In evaluating qualified immunity, courts consider "(1) whether the plaintiff has established the violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation."  <u>Id.</u>  The Court may address these prongs in whatever order "will best facilitate the fair and efficient disposition of [this] case."  <u>Pearson</u>, 555 U.S. at 242. Here, consideration of the latter prong first appears appropriate. <u>See</u> <u>id.</u> at 237 (recognizing that initial consideration of the latter prong may be appropriate for "cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right").

A right qualifies as "clearly established . . . [if] it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  <u>Saucier v. Katz</u>, 533 U.S. 194, 202 (2001), <u>overruled in part on other grounds</u>, <u>Pearson</u>, 555 U.S. at 227.  In other words, "[t]he unlawfulness of the action must be apparent when assessed from the perspective of an objectively reasonable official charged with knowledge of established law." <u>Lopez v. Robinson</u>, 914 F.2d 486, 489 (4th Cir. 1990).  "This is not to say that an official action is protected by qualified immunity

unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987) (citation omitted). In ascertaining whether a right qualified as clearly established at the time of the challenged conduct, courts within this circuit generally "need not look beyond the decisions of the Supreme Court, th[e Fourth Circuit C]ourt of [A]ppeals, and the highest court of the state in which the case arose." Edwards v. City of Goldsboro, 178 F.3d 231, 251 (4th Cir. 1999) (internal quotation marks omitted). However, in the absence of controlling precedent, a right may qualify as clearly established (1) if it appears "manifestly included within more general applications of the core constitutional principles invoked" or (2) based on "a consensus of cases of persuasive authority from other jurisdictions." Booker v. South Carolina Dep't of Corr., __ F.3d __, __, No. 15-7679, 2017 WL 1531576, at *3 (4th Cir. Apr. 28, 2017) (emphasis and internal quotation marks omitted). Conversely, decisions from other jurisdictions that decline to find constitutional violations in similar circumstances can justify application of qualified immunity, in the absence of controlling authority. See Pearson, 555 U.S. at 244-45.

According to the Supreme Court, a prison official's deprivation of an inmate's property may, in appropriate circumstances, violate the Eighth Amendment. See Hudson v. Palmer,

468 U.S. 517, 530 (1984) ("Nor does [the determination that inmates lack a fourth-amendment privacy right vis-à-vis their prison cells] mean that prison attendants can ride roughshod over inmates' property rights with impunity. The Eighth Amendment always stands as a protection against 'cruel and unusual punishments.'"). Notably, though, "neither party has cited cases from courts of controlling authority — the Supreme Court, th[e Fourth Circuit], or the Supreme Court of [North] Carolina — that explicitly address," Booker, __ F.3d at __, 2017 WL 1531576, at *6, whether, under circumstances analogous to this case, any eighth-amendment claim would arise. Nor could the undersigned find such decisions. However, multiple appellate courts have concluded that, at least absent extraordinary circumstances, a prison official's seizure and destruction of an inmate's property does not violate the Eighth Amendment. See Thomas v. New Mex. Corr. Dep't, 272 F. App'x 727, 728, 730 (10th Cir. 2008) (dismissing eighth-amendment claim where, against prison policy, the defendant-officer destroyed the plaintiff-inmate's property rather than permitting him to mail the property home); Nigro v. Wilson, No. 95-56347, 122 F.3d 1073 (table), 1997 WL 542008, at *1 (9th Cir. 1997) (unpublished) (affirming dismissal of "[e]ighth[-a]mendment claims regarding destruction of property"); see also Durham v. Department of Corr., 173 F. App'x 154, 156 (3d Cir. 2006) (affirming dismissal of eighth-amendment claim regarding seizure of property).

Here, certain Defendants destroyed Plaintiff's confiscated photographs. (See Docket Entry 90, ¶ 12.)[10] Although the NCIC found that Defendants acted negligently in destroying the photographs (see Docket Entry 35-29 at 6), the record suggests neither that Defendants acted with malicious or sadistic intent nor that other extraordinary circumstances obviously rendered Defendants' actions cruel and unusual, cf. Womack v. J.P. Morgan, No. CIV. 11-3711, 2012 WL 4479979, at *4 (D. Md. Sept. 25, 2012) (finding that "allegations that correctional officers urinated on [the plaintiff's] personal property . . . demonstrate a sufficiently culpable state of mind in order to satisfy the subjective component of an Eighth Amendment claim"). Thus, under the circumstances of this case, and in light of Thomas, Nigro, and Durham, qualified immunity shields Defendants from Plaintiff's eighth-amendment claim. See Mullenix v. Luna, __ U.S. __, __, 136 S. Ct. 305, 308 (2015) ("The dispositive question is whether the violative nature of *particular* conduct is clearly established." (internal quotation marks omitted; emphasis in original)).

## V. Due Process Claim

Having disposed of the peripheral claims, the analysis turns to Plaintiff's core fourteenth-amendment procedural due process claim. Under the Fourteenth Amendment, states may not "deprive any

---

10 Defendants maintain that they acted in compliance with prison policy in shredding the confiscated photographs. (See id., ¶¶ 12, 19, 24; see also Docket Entry 35-29 at 6.)

person of life, liberty, or property, without due process of law."
U.S. Const. Amend. XIV, § 1.  Procedural due process provides "a
guarantee of fair procedures — typically notice and an opportunity
to be heard."  Kendall v. Balcerzak, 650 F.3d 515, 528-29 (4th Cir.
2011) (internal quotation marks omitted).  Thus, to succeed on his
procedural due process claim, Plaintiff must establish "(1) a
cognizable liberty or property interest; (2) the deprivation of
that interest by some form of state action; and (3) that the
procedures employed were constitutionally inadequate."  Id. at 528
(internal quotation marks omitted).

Defendants do not dispute that Plaintiff satisfies the first
two elements of his claim:  Russell's affidavit establishes that,
in their role as Albemarle Correctional officers, certain
Defendants destroyed Plaintiff's photographs (see Docket Entry 90,
¶¶ 11-12).  See Parratt v. Taylor, 451 U.S. 527, 536-37 (1981)
("Unquestionably, respondent's claim satisfies three prerequisites
of a valid due process claim:  the petitioners acted under color of
state law; the hobby kit falls within the definition of property;
and the alleged loss . . . amounted to a deprivation."), overruled
in part on other grounds by Daniels v. Williams, 474 U.S. 327, 328
(1986).  However, Defendants assert that Plaintiff cannot satisfy
the third element of his procedural due process claim.  (See Docket
Entry 92 at 14-16.)  Defendants' argument possesses merit.

In certain contexts, due process obliges the state to provide notice and a hearing before deprivation occurs. For instance, due process necessitates a predeprivation hearing where "established state procedure" destroys an individual's property interest. Logan v. Zimmerman Brush Co., 455 U.S. 422, 434-36 (1982). However, in circumstances where a state employee's random, unauthorized actions cause the deprivation, the state may lack the ability "to provide a meaningful hearing before the deprivation." Parratt, 451 U.S. at 541. As such, the Supreme Court has concluded that

> an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available. For intentional, as for negligent deprivations of property by state employees, the state's action is not complete until and unless it provides or refuses to provide a suitable postdeprivation remedy.

Palmer, 468 U.S. at 533.[11]

Here, Plaintiff challenges Defendants' destruction of his photographs "without filing an appeal to get the [DHO Order's] verdict overturn[ed]." (Docket Entry 66 at 3.) In other words, Plaintiff challenges not an established state procedure, but rather

---

11 "The rationale [behind this rule] is that because the wrongful act is not sanctioned by any established procedure, and because state law provides a means for the plaintiff to be made whole for his loss occasioned by the wrongful act, there has been no denial of procedural due process because the state action is not necessarily complete until the termination of the state's postdeprivation remedy." Yates v. Jamison, 782 F.2d 1182, 1184 (4th Cir. 1986).

Defendants' decision to destroy his photographs instead of either obeying or appealing the DHO Order. (See Docket Entry 11 at 5 ("Defendant[s] took the law in [their] own hands."); see also Docket Entry 35-29 at 6 (finding that certain Defendants bore, and breached, a duty to comply with the DHO Order).)[12] This claim fits the Parratt and Palmer framework, making the determinative question whether North Carolina provides sufficient postdeprivation remedies for Plaintiff.

North Carolina law permits an individual to pursue a conversion claim against "a public official who by an unauthorized act wrongfully deprives an owner of his property." Wilkins v. Whitaker, 714 F.2d 4, 6 (4th Cir. 1983) (citing Gallimore v. Sink, 27 N.C. App. 65, 67, 218 S.E.2d 181, 182 (1975)).[13] Plaintiff's ability to pursue a conversion claim against Defendants "satisfies the requirements of due process." Id. at 7. Accordingly, Plaintiff's due process claim fails, warranting summary judgment in Defendants' favor. See Fiore v. Milem, No. 1:14cv731, 2016 WL 7168139, at *3 (M.D.N.C. Dec. 8, 2016) (recommending summary judgment on due process claim involving confiscated property),

_____

12 As noted previously, Defendants offer conflicting evidence regarding the existence of this duty as well as the facts regarding the introduction of the photographs into visitation. These factual disputes do not affect the character of Plaintiff's procedural due process claim and thus do not impact the summary judgment analysis.

13 In North Carolina, "public officials have no special immunity for acts that are unauthorized or outside their official duty." Id.

report and recommendation adopted, 2017 WL 943944 (M.D.N.C. Mar. 9, 2017).

## CONCLUSION

Plaintiff's equal protection claim fails for lack of supporting evidence. In addition, Plaintiff's fifth-amendment claims fail because Defendants qualify as state, rather than federal, officials. Moreover, qualified immunity shields Defendants from Plaintiff's eighth-amendment claim. Finally, against the backdrop of North Carolina's conversion tort-law remedy, Plaintiff fails to establish a fourteenth-amendment procedural due process claim.

**IT IS THEREFORE RECOMMENDED** that Defendants' Summary Judgment Motion (Docket Entry 89) be granted and Plaintiff's Second Amendment Complaint be dismissed with prejudice.

This 5th day of May, 2017.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**
